**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0049-17T3

MIDALIA MARTINEZ,

    Petitioner-Appellant,

v.

BOARD OF TRUSTEES, PUBLIC
EMPLOYEES' RETIRMENT SYSTEM,

    Respondent-Respondent.

_____

Argued August 8, 2018 — Decided September 5, 2018

Before Judges Hoffman and Currier.

On appeal from the Board of Trustees of the
Public Employees' Retirement System,
Department of Treasury, PERS No. 2-891062.

Samuel M. Gaylord argued the cause for
appellant (Gaylord Popp, LLC, attorneys;
Samuel M. Gaylord, on the brief).

Juliana C. DeAngelis, Deputy Attorney General,
argued the cause for respondent (Gurbir S.
Grewal, Attorney General, attorney; Melissa H.
Raksa, Assistant Attorney General, of counsel;
Christina Cella, Deputy Attorney General, on
the brief).

PER CURIAM

Petitioner Midalia Martinez appeals from the July 20, 2017 order of the Board of Trustees, Public Employees Retirement System (Board), denying her application for ordinary disability retirement benefits (ODRB). The Board adopted the initial decision of the Administrative Law Judge (ALJ), who found petitioner failed to establish "her inability to perform her job duties." At the end of his decision, the ALJ posed the following two-part question for the Board to answer in its final decision: "Did the Board's use of the 'totally and permanently disabled' standard and/or the Board's early denial of ODRB, i.e., as of August 21, 2013, not on or about January 1, 2014, inappropriately deprive petitioner of rights?" Inexplicably, the Board adopted the ALJ's decision as its final determination in a single sentence, and failed to address either question the ALJ posed. Because the Board did not identify the standard it applied in determining petitioner's ODRB eligibility, or the date used to assess petitioner's application, we reverse the Board's decision and remand for the Board to address those issues.

I

The Camden Board of Education employed petitioner for approximately twenty-four years, until she retired on January 1, 2014. Petitioner testified the essential duties of her clerk

position involved data entry and typing, handwriting reports, filing, and speaking with children's parents.

Around 2008, petitioner developed a mild head tremor. In 2010, petitioner's doctor referred her to John Yang, M.D. for a neurological evaluation. Dr. Yang observed a "very mild horizontal head tremor" and a "[v]ery minimal tremor of the legs . . . ." At that point, his impression was petitioner had a "benign essential tremor," and he recommended she undergo testing.[1] Dr. Yang attempted to treat petitioner's essential tremor with two medications — Inderal and Mysoline; however, Inderal "caused slowed heart rate and blood pressure" and Mysoline left petitioner unable "to function for two days." On March 19, 2013, Dr. Yang reported petitioner's head tremor was "gradually getting worse and she has a lot of anxiety at work as she is conscious of her tremor." A "[m]otor exam revealed tremor of both hands, slightly interfering with handwriting." In addition to "essential tremor," Dr. Yang diagnosed petitioner with anxiety, and prescribed her Xanax.

On June 28, 2013, petitioner underwent an examination by Dr. Steven Lomazow, M.D., a neurologist designated by the Board. In his report, Dr. Lomazow noted petitioner's tremor "has been going

---

[1] The record does not indicate if petitioner underwent this testing.

on for a number of years"; although she continued to work, petitioner stated "her tremor is inhibiting her ability to type, file and do other things that are required on her job." On examination, Dr. Lomazow noted "a fine head tremor and a small degree of bilateral upper extremity tremor, both postural." Dr. Lomazow concluded petitioner "has a mild essential tremor which has not been treated with an adequate clinical trial of medication." He further opined that petitioner "does not have neurological disease which rises to the level of totally and permanently disabled."

On August 21, 2013, the Board denied petitioner's ODRB application, determining she was "not totally and permanently disabled from the performance of [her] regular and assigned duties pursuant to N.J.S.A. 43:15A-42 and relevant case law." Petitioner appealed, and the Board transferred the matter to the Office of Administrative Law for a hearing.

On January 31, 2014, Amy Colcher, M.D. of Cooper Neurological Institute,[2] examined petitioner. Dr. Colcher diagnosed petitioner

_____

[2] The record indicates that Dr. Yang left his group, Neurological Regional Associates, and consequently, petitioner began treating with Dr. Colcher at Cooper Neurological Institute.

with Parkinson's disease[3] and concluded, "She cannot go back to work. Parkinson's disease is an unpredictable disease. It is progressive. She cannot do her job. She cannot talk to people, she cannot type or write, and she has a great deal of difficulty with dexterity. She is totally disabled."

By August 2013, petitioner had stopped working and relocated to Florida; in March 2014, she began both physical and speech therapy at Fossit Therapy Services (FTS). FTS measured petitioner's degree of limitation using physical functional status primary measure (PFSPM). At intake, petitioner's PFSPM was sixty, indicating she was sixty percent functional with a forty percent limitation. Although FTS anticipated at least an eight-point increase, petitioner's PFSPM score showed no change by September 2014. FTS also noted several speech related limitations. In October 2014, petitioner came under the care of another neurologist, Bhupinder Magnat, M.D., who reported petitioner "has features of Parkinson['s] disease."

After learning of Dr. Colcher's conflicting diagnosis, Dr. Lomazow made a request to reevaluate petitioner because his

---

[3] No specific test exists to diagnose Parkinson's disease. A diagnosis is made based on medical history, a review of signs and symptoms, and a neurological and physical examination. See e.g., Diagnosing Parkinson's, American Parkinson Disease Association, https://www.apdaparkinson.org/what-is-parkinsons/diagnosing (last visited Aug. 27, 2018).

"opinion and Dr. Colcher's appear to be quite discordant." On October 1, 2014, Dr. Lomazow performed the reevaluation, and issued a supplemental report, stating he "still see[s] minimal evidence on neurological evaluation" of Parkinson's disease.

On September 12, 2016, the ALJ conducted a hearing and heard testimony from petitioner; Dr. Anca Bereanu, M.D., a board-certified clinical neurologist, who conducted an independent medical examination of petitioner; and Dr. Lomazow. Petitioner testified her primary duties at work included typing and writing and that, except for lunchtime, she spent her entire day on the computer. She asserted the tremors made it increasingly difficult for her to type and write, remarking that "one job that I could have done in five minutes, I was doing it in a whole day." She also testified her head tremors made it difficult to interact with parents, describing situations when parents came in to speak to her and grew frustrated after they assumed she was already shaking her head "no" to questions they had not yet posed. When asked whether she had alerted her superiors to her condition, petitioner responded she had, and the principal had told her, "Just do what you can do, and we'll see what happens."

Petitioner answered several questions about whether she had tried medication to alleviate her tremors. She confirmed she had tried several medications but to no avail, explaining many

A-0049-17T3

medications caused side effects, such as dry mouth, dry eyes, and dizziness. She further testified she was taking Parkinson's disease medication that Dr. Colcher originally prescribed. The medication slightly lessened her symptoms, but only lasted for a short period of time.

Petitioner also presented the expert testimony of Dr. Anca Bereanu, M.D., a board-certified clinical neurologist. Dr. Bereanu conducted an independent medical examination of petitioner on June 17, 2015, and concurred with the findings of both Dr. Colcher and Dr. Magnat. She diagnosed petitioner with "Parkinson's disease with predominant tremor and mild cogwheeling/rigidity." Dr. Bereanu also diagnosed petitioner as having "lumbosacral degenerative disc disease with radicular syndrome and myofasciitis of the cervical and lumbar spine," along with "non-insulin dependent diabetes with episodes of hypoglycemia," and "mild depression, adjustment disorder with mild anxiety . . . ." After reviewing petitioner's job description, she concluded petitioner is "unable to perform the requirements of her job [at the present time of the examination] or in the foreseeable future."

Dr. Bereanu opined petitioner's "coordination and control of . . . movements [are] rather interrupted by tremors. So she could not perform coherent handwriting, and she also could not perform finger activities[,] specifically on the right[,] because

7

of the weakness[,] and on the left because of the tremor." Dr. Bereanu also stated petitioner's "ability to be verbal and to talk either on the phone or in person" is affected. When asked whether medication would prove helpful, Dr. Bereanu testified that both alleged diseases would be difficult to treat with medication, and that patients typically become resistant over time.

During Dr. Bereanu's physical examination of petitioner, she observed that petitioner had tremors in her upper extremities and head, a low and raspy voice that lost volume while speaking, and bradykinesia, which she described as "a very slow motion." Dr. Bereanu also noticed weakness and clumsiness with cogwheeling/rigidity of the right hand, wrist, fingers, and forearm. When petitioner wrote a sentence as part of the exam, Dr. Bereanu described the result as "mostly scribbled" and "tremulous" and noted "[t]he characters were small." Dr. Bereanu based her diagnosis on the correlation between those observations and Parkinson's disease.

When asked about Dr. Yang's inconsistent diagnosis, Dr. Bereanu explained the two diagnoses do not necessarily conflict. She described benign essential tremor as a tremor with an undefined cause, typically an exclusionary diagnosis. Since Dr. Yang's reports indicate petitioner had not yet developed rigidity when he last examined her in early 2013, and since rigidity constitutes

a necessary symptom for Parkinson's disease, Dr. Yang made benign essential tremor the clinical diagnosis,

At the end of her direct examination, the ALJ asked Dr. Bereanu how petitioner's medical records, combined with her examination that was conducted significant after petitioner's retirement, could cause her to conclude petitioner was incapacitated as of January 2014. Dr. Bereanu responded that when the tremor becomes "complicated by rigidity," she can conclude that it would be incapacitating. Because Dr. Colcher found rigidity in petitioner's January 2014 examination, Dr. Bereanu stated she can conclude petitioner was incapacitated as of January 2014.

The Board presented Dr. Lomazow's testimony, who opined petitioner has a mild essential tremor, not Parkinson's disease, and concluded her tremors are not of a degree to be "totally and permanently disabling." Dr. Lomazow stated he did not observe any of the symptoms indicating Parkinson's disease that petitioner's other doctors observed. Nevertheless, he acknowledged that during his second examination, petitioner held her hand rigid to her right side. When asked what caused this symptom, Dr. Lomazow speculated petitioner may have been in pain, but described her as "conscious" of what she was doing. Dr. Lomazow further opined that petitioner was not taking large enough quantities of her

prescribed medication to be useful, describing her dosage as "an entry level kindergarten kind of dose."

Dr. Lomazow acknowledged that a benign essential tremor is "generally a progressive disease that gets worse with age" and it is possible for an essential tremor to cause total permanent disability. Dr. Lomazow also acknowledged it was "conceivable" that neurologists would differ in their opinion as to whether petitioner has Parkinson's disease, but in his opinion, she does not. He further stressed that emphasis should not be on petitioner's diagnosis, but on "the crux of the matter, [i.e.,] is she totally and permanently disabled." Dr. Lomazow conceded he observed "a slight amount more tremor" at the time of his second examination of petitioner.

On June 15, 2017, the ALJ issued his Initial Decision, concluding he "cannot find that in January 2014 petitioner's condition resulted in her inability to perform her job duties, or that the employer did not attempt to accommodate her needs." In reaching this decision, the ALJ determined he "cannot accept Dr. Bereanu's opinion to a reasonable degree of medical certainty," and further stated his "rejection of [her] opinion is based upon the observations from the prior medical examinations of Dr. Yang and Dr. Lomazow; the petitioner's historical functional-limitation

10

representations to [FTS] at and around March 5, 2014; and the fact that Dr. Bereanu did not examine petitioner until June 17, 2015."

As noted, in his decision the ALJ questioned whether the proper standard for determining ODRB eligibility is "totally and permanently disabled" or "physically or mentally incapacitated for the performance of duty."  He concluded that based on the plain language and legislative intent of N.J.S.A. 43:15A-42, the correct standard applicable to petitioner's application was "physically or mentally incapacitated for the performance of duty."[4]

II

Our scope of review of an administrative agency's final determination is limited.  In re Herrmann, 192 N.J. 19, 27 (2007). "[A] strong presumption of reasonableness attaches" to the agency's decision.  In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (internal quotations and citation omitted).  To that end, we will "not disturb an administrative agency's determinations or findings unless there is a clear showing that[:] (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Application of

---

[4]  Notably, N.J.A.C. 17:1-6.4 (effective June 20, 2016), now requires all disability retirements to satisfy the "total and permanent disability" standard.

<u>Virtua-W. Jersey Hosp. Voorhees</u>, 194 N.J. 413, 422 (2008) (citations omitted).

It is not our place to second-guess or substitute our judgment for that of the agency and, therefore, we do not "engage in an independent assessment of the evidence as if [we] were the court of first instance." <u>State v. Locurto</u>, 157 N.J. 463, 471 (1999). However, "we are not bound by an agency's construction of a statute just as we are not bound by its other, strictly legal determinations." <u>Patel v. N.J. Motor Vehicle Comm'n</u>, 200 N.J. 413, 420 (2009) (citation omitted).

On appeal, we cannot determine whether the Board applied the proper standard in reviewing petitioner's disability application, nor can we properly address if the Board's early ODRB denial, "i.e., as of August 21, 2013, not on or about January 1, 2014," inappropriately deprived petitioner of rights. Because the Board did not address the questions the ALJ posed in his initial decision, we have no basis for determining whether the Board used the proper standard or date in determining petitioner's ODRB eligibility. Accordingly, we are constrained to remand this matter to the Board to reconsider petitioner's claim, after identifying and applying the controlling standard to the correct date. We add the following comments.

A-0049-17T3

For petitioner, it would appear the ALJ identified the correct standard for determining eligibility for ODRB benefits, explaining petitioner had "the burden to establish by a preponderance of the credible medical evidence that she is physically or mentally incapacitated" from performing her job duties. The plain text of N.J.S.A. 43:15A-42, clearly supports this standard:

> A member, under [sixty] years of age, who has [ten] or more years of credit for New Jersey service, shall, upon the application of the head of the department in which he [or she] shall have been employed or upon his [or her] own application or the application of one acting in his [or her] behalf, be retired for ordinary disability by the board of trustees. The physician or physicians designated by the board shall have first made a medical examination of him [or her] at his [or her] residence or at any other place mutually agreed upon and shall have certified to the board that the member is <u>physically or mentally incapacitated for the performance of duty</u> and should be retired.
>
> [(Emphasis added).]

The rules governing statutory construction are well-settled. "Except whe[n] uncertainty and ambiguity appear, a statute must speak for itself and be construed according to its own terms." Rosenthal v. State Emp. Ret. Sys., 30 N.J. Super. 136, 140 (App. Div. 1954); see also DiProspero v. Penn, 183 N.J. 477, 492 (2005).

Assuming the Board agrees with the ALJ as to the correct standard to apply, the Board should address whether Dr. Lomazow

13

provided testimony addressing that standard and whether he gave consideration to petitioner's other medical issues, such as back pain, diabetes, and depression, in formulating his opinion.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0049-17T3